**2022 IL 126729**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 126729)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
KELVIN T. HARTFIELD, Appellee.

*Opinion filed April 21, 2022.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Theis, Michael J. Burke, and Overstreet concurred in the judgment and opinion.

Justice Carter specially concurred, with opinion, joined by Justice Neville.

**OPINION**

¶ 1     Defendant fired a gun at four police officers and was ultimately convicted of armed robbery (720 ILCS 5/18-2(a)(2) (West 2016)) and four counts of aggravated discharge of a firearm (*id.* § 24-1.2(a)(3)). The appellate court vacated three of the

four aggravated discharge convictions and remanded for resentencing but otherwise affirmed. 2020 IL App (4th) 170787.

¶ 2    The central issue in this case is whether a single shot in the direction of multiple peace officers can support multiple convictions of aggravated discharge. We also address defendant's request for cross-relief.

¶ 3                                    BACKGROUND

¶ 4    There are three distinct legal issues before us. The appellate court sufficiently presented the facts in their entirety. *Id.* ¶¶ 10-36. We present only those relevant to our disposition.

¶ 5                                *Aggravated Discharge*

¶ 6    Police suspected defendant of robbing a gas station. After locating defendant, four officers confronted him. Defendant ran. As he was running, he fired a gun in the direction of the officers. Officers returned fire. No officers were hit, but afterwards, they found what appeared to be bullet holes near where at least one of the officers had been standing. It is unclear how many shots defendant fired at the officers, but there is evidence that he fired more than one shot.

¶ 7                                   *Speedy Trial*

¶ 8    Defendant was arrested on July 27, 2016. The State sought, and was granted, six continuances so that it could obtain forensic analysis on fingerprint and DNA evidence.

¶ 9    On August 30, 2016, at the hearing on the State's first motion for continuance, defendant's case number was called. Defendant's counsel immediately objected in the following manner:

    "Judge, he's in custody. Ready for trial. Please note my objection to the State's motion."

¶ 10    The Champaign County circuit court ultimately responded:

"We'll show the State's motion to continue. Objection. This is pursuant to 725 ILCS 5/114-4, 725 ILCS 5/103-5(c). I'll note the objection. The objection's overruled. We'll continue these matters, September 27, 9:00, this courtroom."

¶ 11    The State and the circuit court then addressed the State's outstanding motion to collect standards from defendant. The State renewed that motion, and the court instructed the State to prepare an order.

¶ 12    Defendant ultimately went to trial on March 6, 2017.

¶ 13                                *Number of Discharges Prosecuted*

¶ 14    Defendant was charged with armed robbery (720 ILCS 5/18-2(a)(2) (West 2016)) and four separate counts of aggravated discharge of a firearm (*id.* § 24-1.2(a)(3)). The charging instrument included four counts. They were identical save for the name of the officer at issue in each count:

"That on July 26, 2016, in Champaign County, Kelvin D Hartfield committed the offense of

AGGRAVATED DISCHARGE OF A FIREARM
Class X Felony SENTENCING RANGE 10 to 45 YEARS INCARCERATION

in that the said defendant knowingly discharged a firearm in the direction of [officer's name], a person he knew to be a peace officer and, at the time, [officer's name] was engaged in the execution of his official duties,

in violation of 720 Illinois Compiled Statutes 5/24-1.2(a)(3)."

¶ 15    During closing arguments, the State recounted each officer's testimony that they had been fired upon by defendant. The State continued:

"Incidentally, sounds like, it seems like most logically, although obviously we don't, we can't know this, but it seems likely there were probably three shots fired by the Defendant. When the revolver's found, of course, there are three expended cartridges inside, three casings left with the bullets already fired, two still live rounds in there. That's consistent with essentially what the officers

- 3 -

said. I don't want you to be troubled, I suggest to you you don't need to be troubled by the fact that we've got four officers who are charged with being victims of this offense and only three bullets possibly fired. Now, could the Defendant have reloaded later? Something like that could have happened. It's entirely possible that he shot more than three, but let's work just—let's give the benefit of the doubt, let's work with the proposition that maybe only three shots got fired. Does that mean there are only three counts? No. You could do five counts on one bullet, if you needed to.

The issue is not how many shots were fired, the issue is how many people got shot toward. If you got a bunch of people in a huddle hugging each other, you take one shot towards the huddle, you're shooting in the direction of all of those people. So it's not a matter of, did he pull the trigger three times, therefore there's three counts. It's an issue of how many people did he shoot at, and that's four. He shot at all four of those officers."

¶ 16   In its petition for leave to appeal to this court, the State acknowledged:

"The State charged defendant with four counts of aggravated discharge of a firearm. [Citation.] In doing so, the State relied on the number of officers at whom defendant fired and not the number of shots he fired. [Citation.] Similarly, during closing argument, the State took the position that regardless of the number of shots fired, four guilty verdicts were appropriate because defendant had fired in the direction of four police officers. [Citations.]"

¶ 17                           *Mid-Deliberation Jury Instruction*

¶ 18   Prior to deliberations, the jury was instructed: "A person commits the offense of aggravated discharge of a firearm when he knowing[ly] discharges a firearm in the direction of a person he knows to be a peace officer, while the officer is engaged in the execution of his official duties."

¶ 19   The following instruction was then repeated, in its entirety, four times—once for each officer:

"To sustain the charge of aggravated discharge of a firearm in the direction of [officer's name], the State must prove the following propositions. First

- 4 -

proposition, that the Defendant knowingly discharged a firearm. Second proposition, that the Defendant discharged a firearm in the direction of [officer's name]. Third proposition, that the Defendant knew that [officer's name] was a peace officer. And fourth proposition, that the Defendant did so while the peace officer was engaged in the execution of his official duties.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the Defendant guilty. If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the Defendant not guilty."

¶ 20    During deliberations, the jury sent the following note to the circuit court:

"Does suspect need to know there were 4 cops on the scene in the area where gun was fired [followed here by what appears to be a question mark, perhaps scribbled out] to be guilty of all four counts of [aggravated] discharge of firearm?

third Proposition: That the defendant knew that _____ was peace officer."

¶ 21    The circuit court and the State began discussing what the answer might be. The court at times treated the note as presenting a single question and at other times as presenting two questions. The State repeatedly referred to two "parts" that needed to be answered. The court tentatively concluded that the answer to the first question was "no," and in response, the State asked for the court to read the aggravated discharge jury instruction again. After doing so, the State agreed with the court's answer to the "first one." The State continued, however, by agreeing with the court's concern that the jury still had to find, beyond a reasonable doubt, as to each individual officer.

- 5 -

¶ 22    At this point, defense counsel interjected for the first time by saying: "Judge, please note my objection to any—I believe the appropriate response is, you've been instructed as to the law. Please note my objection to any—anything beyond that." The circuit court and the State then began to discuss the "second question." The court presented an answer, noting that under this proposed instruction, the jury "may determine that two of the officers weren't in the line of fire, one was, two were, or three were." The State ultimately agreed with the court's second answer by saying, "I think that seems fair." Defense counsel did not give any input or make any indication that this answer was unsatisfactory. The court then noted defense counsel's objection before stating that the decision had been made. The following response was then sent to the jury:

> "Question #1
>
> No
>
> Question #2
>
> You must determine based on the evidence which officer or officers, if any, may have been in the line of fire when the firearm was discharged."

¶ 23    The jury returned a guilty verdict on all five counts. In his posttrial motion, defendant wrote:

> "The Court erred by giving further instructions to the jury during deliberations and while they had questions about the law as it related to Aggravated Discharge of a Firearm. The jury had been given all of the instructions required to render a verdict and did not need further clarification by the Court. The Court should have instructed the jury they were to follow the law as they had been previously instructed. Within minutes of giving further instructions to the jury, the jury returned guilty verdicts."

¶ 24    *Sentencing and Appeal*

¶ 25    After denying defendant's posttrial motion, the circuit court held a sentencing hearing. The court imposed a sentence of 40 years' imprisonment on the armed robbery conviction and concurrent sentences of 10 years' imprisonment for three

of the aggravated discharge convictions. On the fourth aggravated discharge conviction, the court imposed a discretionary consecutive sentence of 40 years' imprisonment based on its understanding that defendant had aimed at, and came very close to hitting, that particular officer.

¶ 26    On appeal, defendant raised six issues. Relevant here, he raised a speedy trial, public trial, and jury instruction issue. After the first round of briefs, the appellate court was left with reservations about the four aggravated discharge convictions and ordered supplemental briefing on the question of whether these convictions violated the one-act, one-crime doctrine of *People v. King*, 66 Ill. 2d 551, 566 (1977). 2020 IL App (4th) 170787, ¶ 72.

¶ 27    In its opinion, the appellate court found no speedy trial or public trial violation and no reversible error on the jury instruction issue. On the multiple convictions issue, it first determined that the State had effectively prosecuted defendant based on his firing a single shot at four officers. *Id.* ¶ 75. Consequently, the court considered whether a single discharge could support multiple convictions. The court concluded that the one-act, one-crime rule did not apply because the unit of prosecution for an aggravated discharge was based on the number of discharges, rather than the number of officers in the direction of discharge. *Id.* ¶ 90. Thus, by its own terms, the statute imposed only a single conviction in this case. *Id.* ¶ 91. The court ultimately vacated three of the four aggravated discharge convictions and remanded for resentencing. *Id.* ¶ 94. It otherwise affirmed the circuit court's judgment. *Id.*

¶ 28    Both the State and defendant appealed to this court. Ill. S. Ct. R. 315 (eff. Oct. 1, 2019). We allowed the State's petition and held defendant's petition. After the State's opening brief, defendant requested cross-relief.

¶ 29                                    ANALYSIS

¶ 30                                    *Speedy Trial*

¶ 31    We begin with defendant's request for cross-relief. Defendant first argues that his right to a speedy trial was violated because he was not brought to trial within 120 days of being brought into custody.

¶ 32    The people of Illinois possess both constitutional and statutory rights to a speedy trial. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; 725 ILCS 5/103-5(a) (West 2020). Although Illinois's speedy trial statutes implement the constitutional right, the statutory and constitutional rights are not coextensive. *People v. Sandoval*, 236 Ill. 2d 57, 67 (2010). Defendant claims only a statutory violation.

¶ 33    Defendant concedes that he has "forfeited" this issue. He asks us to excuse this "procedural forfeiture" on plain error or ineffective assistance grounds. The State asserts that defendant "waived" it because he failed to raise it in a pretrial motion to dismiss and in a posttrial motion. Under Illinois law, a defendant must make a pretrial motion to dismiss the case for a statutory speedy trial violation "within a reasonable time after the defendant has been arraigned." 725 ILCS 5/114-1(a)(1), (b) (West 2016). "Any motion not filed within such time or an extension thereof shall not be considered by the court and the grounds therefor *** are waived." *Id.* § 114-1(b). Putting aside the question of whether defendant has "forfeited" or "waived" his speedy-trial right and the attendant question of whether plain-error review is appropriate, we hold that no error occurred.

¶ 34    Defendant acknowledges that, if the first continuance was lawful, then no speedy-trial violation occurred. He challenges that continuance on two grounds. First, he argues that defense counsel demanded trial at the hearing on the first continuance by saying: "Judge, he's in custody. Ready for trial. Please note my objection to the state's motion."

¶ 35    A defendant in custody must be tried within 120 days from the date she was taken into custody unless delay is occasioned by the defendant. *Id.* § 103-5(a). Delay is considered to be agreed to by the defendant unless "she objects to the delay by making a written demand for trial or an oral demand for trial on the record." *Id.* From this statutory language, it is clear that a mere objection to delay does not suffice to invoke the statutory speedy-trial right. Rather, the defendant must make an objection specifically by demanding trial. "The statute does not mandate any 'magic words' constituting a demand for trial, but it requires some affirmative statement in the record requesting a *speedy* trial." (Emphasis in original.) *People v. Phipps*, 238 Ill. 2d 54, 66 (2010). We have explained that the speedy-trial right is properly used as a shield against any attempt to place the defendant's trial date

outside the 120-day period but that it may be improperly used as a sword after the fact to defeat a conviction. *People v. Cordell*, 223 Ill. 2d 380, 390 (2006). Consequently, the statute puts the onus on a defendant to take affirmative action when she becomes aware that her trial is being delayed. *Id.* at 391. The defendant may not camouflage her intent or hide the demand from the prosecutor's notice. *People v. Huff*, 195 Ill. 2d 87, 94 (2001).

¶ 36    Here, defendant's statement of custodial status and readiness for trial does not, by itself, equate to a demand that the government set in motion the necessary machinery to try him within 120 days. Defendant cites *People v. Murray*, 379 Ill. App. 3d 153, 161-62 (2008), for the proposition that a recognized objection to delay coupled with "language that would be used only in reference to [his] speedy trial right" is sufficient to invoke the right. As the appellate court pointed out, however, *Murray* is distinguishable in two ways. First, the defendant in *Murray* stated his desire "that the delay be attributed to the State," whereas here, defendant merely stated that he was in custody and ready for trial. *Id.* at 161. The statement from *Murray* is directly related to the speedy-trial right, whereas the statement here is related to delay in general—or even, perhaps, to defendant's second argument, discussed below, that the State's motion was deficient in some way. Defendant argues that his custodial status was irrelevant apart from his statutory right to speedy trial, but the question under *Murray* is whether the statement includes language "that would be used only in reference to [his] speedy trial right." A statement of custodial status may be used in reference to many aspects of a defendant's case apart from speedy-trial concerns.

¶ 37    Second, we agree with the appellate court that a circuit court's recognition of the alleged demand is relevant. The fact that a circuit court recognizes an objection as a demand for trial, or as otherwise invoking the speedy-trial right, is weighed differently than a circuit court's recognition of a mere objection. Where the circuit court recognizes the objection as a demand for trial, there is a more complete understanding that an affirmative demand has been made and understood. Here, the circuit court only recognized an objection without recognizing the objection as a demand for trial.

¶ 38    Because defendant did not demand trial, he is considered to have agreed to the first continuance, and this first argument fails. Defendant makes no argument that

counsel was ineffective for failing to demand trial at the hearing on the first continuance. Rather, he argues counsel was ineffective for failing to file a pretrial or posttrial motion on this issue. Counsel is not ineffective for failing to file futile motions. *Phipps*, 238 Ill. 2d at 65, 70. Consequently, trial counsel was not ineffective.

¶ 39 Defendant's second challenge to the first continuance is that the circuit court abused its discretion in granting it because the State failed to show due diligence in obtaining material evidence. The speedy-trial statute provides that, if the court determines that the State has exercised due diligence to obtain material evidence or DNA evidence, the court may continue the case on application of the State for 60 or 120 days, respectively. 725 ILCS 5/103-5(c) (West 2016). The State's first motion for continuance represented that, within 22 days of the crime and 20 days of defendant's arrest, the State had collected material evidence and delivered it to the laboratory for forensic analysis. The motion further represented that, as of the day before the hearing on the first continuance, the lab indicated that the evidence had been received, that analyses had been assigned and were pending, and that no reports were yet available. We find no abuse of discretion in the circuit court's determination that the State had exercised due diligence based upon this motion and timeline. We decline the defendant's request to require something more than what was done here. We note that defendant also challenges the third motion for continuance, but given that the first motion was properly granted, we need not address that challenge. Given this holding, counsel was not ineffective for failing to raise this issue in a pretrial or posttrial motion.

¶ 40 *Jury Instructions*

¶ 41 Defendant next argues that his rights to due process and to a jury trial were violated by the two answers included in the mid-deliberation instruction. U.S. Const., amends. V, VI, XIV; Ill. Const. 1970, art. I, §§ 2, 8, 13. Specifically, defendant argues that the first answer eliminated the knowledge element from all four counts of aggravated discharge. Defendant argues that the circuit court should have responded "Yes" to the first question. On the second answer, defendant argues that this was an incorrect statement of law, which lowered the State's burden of proof by instructing the jury that it only had to determine that the officers *may have*

been in the line of fire, rather than that the officers *were* in the direction of discharge.

¶ 42    A jury instruction error, although one of constitutional magnitude, is not necessarily a structural error and therefore does not result in automatic reversal. *Neder v. United States*, 527 U.S. 1, 8-15 (1999); *People v. Washington*, 2012 IL 110283, ¶ 59. If the error was preserved, then harmless-error analysis applies. *People v. Herron*, 215 Ill. 2d 167, 181-82 (2005) (citing *People v. Thurow*, 203 Ill. 2d 352, 363 (2003)). If the error was forfeited, then plain-error analysis applies. *Id.* at 182.

¶ 43    The parties dispute whether these issues were forfeited. The State argues that defendant did not object on these specific grounds at trial nor raise them in his posttrial motion. Essentially, the State argues that defendant objected to the *giving* of the mid-deliberation instruction but failed to object to the *content* of the instruction. Defendant concedes that he did not expressly argue against the legal accuracy of the instruction, but he argues that, by objecting to giving *any* additional instruction, he necessarily objected to the content of that additional instruction.

¶ 44    "Generally, a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion." *Herron*, 215 Ill. 2d at 175. "The so-called waiver principle encourages the defendant to raise issues before the trial court, allowing the court to correct its own errors before the instructions are given, and consequently disallowing the defendant to obtain a reversal through inaction." *Id.* (citing *People v. Ford*, 19 Ill. 2d 466, 478-79 (1960) ("An accused may not sit idly by and allow irregular proceedings to occur without objection and afterwards seek to reverse his conviction by reason of those same irregularities.")). Defendant properly points out that this rule does not require that the objections at trial and in the posttrial motion be exactly identical in order to be preserved on review (*People v. Mohr*, 228 Ill. 2d 53, 65 (2008)), but here we are dealing with a different situation: defendant properly raised one issue below and raises a different one now.

¶ 45    The two issues are distinct and warrant different standards of review. *People v. Pierce*, 226 Ill. 2d 470, 475 (2007) ("Although the giving of jury instructions is generally reviewed for an abuse of discretion, when the question is whether the jury

instructions accurately conveyed to the jury the law applicable to the case, our review is *de novo*."). Determining whether the decision to give an additional instruction was proper requires us to test the circumstances surrounding the decision to give that instruction. Determining whether the instruction itself is legally correct, however, requires us to test the content of the instruction for legal accuracy.

¶ 46    Although in some cases an objection to the giving of an instruction is necessarily based on the content of the instruction itself, we do not believe that is the case here. First, defendant's contemporaneous objection occurred before the entirety of the response had been drafted. Second, defendant's proffered instruction did not include any clarification or answer to the jury's question, thereby suggesting that the proper course of action was to decline to give any substantive response. Third, defendant's posttrial motion specifically argued that the jury had been given all the instruction it needed and that the circuit court should have instructed the jury it was to follow those previous instructions.

¶ 47    All of these points relate to the decision to give a substantive answer to the jury's question.

> "The general rule when a trial court is faced with a question from the jury is that the court has a duty to provide instruction to the jury when the jury has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion." *People v. Millsap*, 189 Ill. 2d 155, 160 (2000).

"This is true even though the jury was properly instructed originally." *People v. Childs*, 159 Ill. 2d 217, 229 (1994). "If the question asked by the jury is unclear, it is the court's duty to seek clarification of it." *Id.* "Nevertheless, a trial court may exercise its discretion to refrain from answering a jury question under appropriate circumstances." *Millsap*, 189 Ill. 2d at 161. Here, the jury asked a specific question regarding the knowledge element of the offense. That question, about whether defendant had to know the precise number of officers on scene to be convicted of an equal number of aggravated discharge offenses, was a fair question that was not answered by the original instructions. As even defendant says in his brief, the jury's note evinced some confusion on another issue, as well: whether the officers had to be merely "on scene" rather than "in the direction of" discharge. The circuit court

was clearly obligated to provide some kind of substantive answer to the jury's explicit question and implicit confusion.

¶ 48 The question raised now, however, is whether the content of the mid-deliberation instruction was erroneous. The circuit court did not have an opportunity to consider the propriety of the instruction's legal content because no specific objection was made to it and because defense counsel did not participate in the crafting of the response in any way. A mere objection to a proffered jury instruction is not sufficient to preserve every single instructional issue that might arise from it. Nor will making an objection on a specific issue preserve all others for review. We conclude that, in this case, defendant has forfeited his objection to the legal accuracy of the mid-deliberation instruction.

¶ 49 Nevertheless, we will review unpreserved jury instruction errors pursuant to Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013), which provides that "substantial defects [in jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require." "Rule 451(c) is coextensive with the 'plain error' clause of Supreme Court Rule 615(a), and we construe these rules 'identically.' " *Herron*, 215 Ill. 2d at 175 (citing *People v. Armstrong*, 183 Ill. 2d 130, 151 n.3 (1998)). The plain-error clause of Rule 615(a) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967).

¶ 50 Plain error occurs where "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *Herron*, 215 Ill. 2d at 187. In the first instance, the defendant must show that clear or obvious error occurred and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. In the second instance, the defendant must show that clear or obvious error occurred and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *Id.* "Prejudice to the defendant is presumed because of the importance of the right involved, '*regardless* of the strength of the evidence.' " (Emphasis in original.) *Id.* (quoting *People v. Blue*, 189 Ill. 2d 99, 138 (2000)). "In both instances, the burden of persuasion remains with the defendant." *Id.* Plain-error review is designed to protect both the defendant's rights and the integrity of the judicial system. *Id.* at 177. We have held that a jury

instruction error rises to the level of plain error only when it " 'creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial.' " *Id.* at 193 (quoting *People v. Hopp*, 209 Ill. 2d 1, 8 (2004)).

¶ 51        Inherent in plain-error analysis is a determination of whether any error occurred. The function of jury instructions is to provide the jury with accurate legal principles to apply to the evidence so it can reach a correct conclusion. *Hopp*, 209 Ill. 2d at 8. Whether the jury instructions accurately conveyed to the jury the applicable law is reviewed *de novo*. *Pierce*, 226 Ill. 2d at 475. "We must determine whether the instructions, taken as a whole, fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *People v. Parker*, 223 Ill. 2d 494, 501 (2006); *People v. Terry*, 99 Ill. 2d 508, 516 (1984) ("Instructions in criminal cases must be read as a whole. 'It is sufficient if the series of instructions, considered as a whole, fully and fairly announce the law applicable to the respective theories of the People and the defense.' " (quoting *People v. Kolep*, 29 Ill. 2d 116, 125 (1963))). Although jury instructions should be considered as a whole and not in isolation, "this proposition rests on the assumption that the jury instructions clearly and properly inform the jurors of the law." *People v. Alvine*, 173 Ill. 2d 273, 290 (1996).

¶ 52        Although the trial court's response includes two answers, there is arguably only one question presented by the jury's note. The court did not seem to have been confused as to the number of questions being asked. Neither did the State and, as we have discussed, defense counsel did not participate. We proceed with our analysis because this particular oddity does not affect the outcome.

¶ 53        Regardless of whether the first answer—"No"—is an accurate statement of law, the second answer—"You must determine based on the evidence which officer or officers, if any, may have been in the line of fire when the firearm was discharged"—is not an accurate statement of law. The offense of aggravated discharge requires the jury to determine whether a peace officer *was* in the *direction of discharge*; but the second answer instructed the jury to determine whether a peace officer *may have been* in *the line of fire*. If the phrase "in the line of fire" has the exact same meaning as "in the direction of," then the court improperly instructed the jury on the burden of proof by instructing it to determine whether an

officer "*may have been* in the direction of discharge" rather than whether an officer "*was* in the direction of discharge." (Emphases added.)

¶ 54     On the other hand, if the two phrases are *not* equivalent, then the court instructed the jury to determine a fact that is not required by the statute. The appellate court employed a useful hypothetical to show how it concluded that the two phrases are distinct:

"[L]et us say that, with the intention of merely scaring *A*, *B* carefully aims at a window to the side of *A* and shoots out the glass. *A* would not be in the line of fire, and, when pulling the trigger, *B* would know that *A* was not in the line of fire. Nevertheless, *B* would fire in *A*'s direction, and *B* would know he was firing in *A*'s direction." 2020 IL App (4th) 170787, ¶ 69.

¶ 55     This distinction is a reasonable one, but even if the two phrases are distinct, we would conclude that the second answer is legally incorrect. In the appellate court's hypothetical, *A* was "in the direction of" discharge while not being "in the line of fire," but the circuit court here instructed the jury to determine whether *A* "*may have* been in the line of fire." (Emphasis added.) That would be a different task than determining whether *A* "was in the direction of" discharge, because it would require the jury to determine if the "expected path of gunfire," as the appellate court defined it, may have ever crossed over *A*. This fact is not required by the statute. The only fact required by statute is that the firearm is discharged "in the direction of" a peace officer. The gun may be repeatedly fired "next to" the peace officer, with the "line of fire" never crossing the body of the peace officer, and the shooter would still have satisfied the trajectory element of aggravated discharge.

¶ 56     The question then becomes whether this error rises to the level of plain error.

¶ 57     Defendant essentially argues that the giving of conflicting instructions amounts to second-prong plain error, citing the following cases: *People v. Pollock*, 202 Ill. 2d 189, 212 (2002) ("[I]f conflicting instructions are given, one being a correct statement of law and the other an incorrect statement of law, the error cannot be deemed harmless."); *People v. Bush*, 157 Ill. 2d 248, 254 (1993) ("[T]he giving of conflicting instructions, one of which is a correct statement of law and the other an incorrect statement of law, is not harmless error."); *People v. Haywood*, 82 Ill. 2d 540, 545 (1980) ("[T]he rule in Illinois is that when conflicting instructions are

given, one of which is a correct statement of law and the other is an incorrect statement of law, the error is not harmless."); and *People v. Jenkins*, 69 Ill. 2d 61, 66 (1977). The State argues that this principle only applies in harmless-error analysis. We note that all of the cases cited by defendant, except for *Jenkins*, were decided in the context of harmless error.

¶ 58    In *Jenkins*, two instructions were proffered, one by the State and one by the defendant. *Jenkins*, 69 Ill. 2d at 64. The State's instruction was absent of any reference to an essential element that was also at issue in the case. *Id.* at 65. The defendant's instruction properly listed the elements. The defendant did not object to the State's instruction, and both were given. *Id.* This court specifically held that the issue warranted review under Rule 451(c)'s saving clause for unpreserved jury instruction issues. *Id.* at 65-66. Ultimately, this court reversed and remanded for a new trial, explaining:

> "[W]here the instructions are contradictory, the jury cannot perform its constitutional function. This inability is the fault of the court, whose duty it is to give the jury proper guidance, not to generate confusion, as was the case here. It is well established that the giving of contradictory instructions on an essential element in the case is prejudicial error, and is not cured by the fact that another instruction is correct. While it is true that an instruction may be inaccurate, and other instructions may remove this error, such cannot be so when the instructions are in direct conflict with one another, one stating the law correctly and the other erroneously. This is particularly true where the instruction defines the issues in the case or is mandatory in character. [Citations.]
>
> Where the instructions are contradictory the jury is put in the position of having to select the proper instruction—a function exclusively that of the court. As far as can be known, defendant might well have been convicted on the basis of the erroneous instruction. Certainly, a person should not stand to lose his liberty because a jury has received equivocal instructions." *Id.* at 66-67.

¶ 59    This court came to this conclusion without reviewing the evidence in the case. Although our plain-error analysis of jury instruction issues has evolved since *Jenkins*, it nevertheless remains good law. Whereas a single erroneous instruction might be cured by other instructions or by some other showing of a lack of prejudice, two directly conflicting instructions on an essential element, one stating

the law correctly and the other erroneously, cannot be cured this way due to the simple fact that we can never know which instruction the jury was following. What is at issue with this error is the integrity of the judicial system itself. Thus, regardless of whether it is plain-error or harmless-error analysis, such an error is presumed to be prejudicial.

¶ 60　　　Turning back to the second answer in the mid-deliberation instruction, we conclude that there is such an error here. As we outlined above, the second answer contains two possible interpretations. Under the first interpretation (that "in the line of fire" is equivalent to "in the direction of discharge"), the jury was improperly instructed to determine whether any officers "may have been" in the direction of discharge. That instruction directly contradicted the earlier instruction that the jury had to determine beyond a reasonable doubt the "Second proposition, that the Defendant discharged a firearm in the direction of [officer's name]." Consequently, the two instructions directly conflict on the burden of proof in relation to an essential element of the offense.

¶ 61　　　We note that there may be a cogent argument that the second interpretation (wherein "in the line of fire" is distinct from "in the direction of discharge") does not directly conflict with the prior instructions nor actually prejudice defendant. The problem is that we cannot know which interpretation the jury accepted and, given that both interpretations are incorrect statements of law, it is irrelevant. The jury was given contradictory instructions on an essential element, and we cannot know whether the jury relied on the proper instruction. There is a serious risk that the jury incorrectly found defendant guilty on some count because it found that the officer in that count may have been in the line of fire, rather than actually was in the direction of discharge. We will not take the place of the jury in attempting to determine which counts that might have affected and which might have survived. Remand and retrial are necessary.

¶ 62　　　　　　　　　　　　　　*Public Jury Selection*

¶ 63　　　Lastly on cross-relief, defendant argues that his constitutional right to a public trial was violated because the circuit court excluded spectators from the courtroom during certain portions of jury selection without making adequate findings in support. See *Presley v. Georgia*, 558 U.S. 209, 213 (2010) (*per curiam*); U.S.

Const., amend. VI. However, the remedy for such a violation would be a new trial. Because we have already determined that retrial is necessary, we do not reach this issue.

¶ 64                          *Surplus Convictions*

¶ 65          *Number of Discharges Effectively Alleged/Forfeiture*

¶ 66     We now turn to the issue raised in the State's petition for leave to appeal, which will likely recur on retrial: whether a single discharge in the direction of multiple peace officers can support multiple convictions of aggravated discharge of a firearm.[1] Defendant argues that a single discharge can only support a single aggravated discharge conviction, regardless of how many officers are in the direction of fire. The State argues that one conviction for each officer is required, or at least justified.

¶ 67     This question was initially raised under the one-act, one-crime rule of *King*, 66 Ill. 2d 551. A threshold question to reaching the one-act, one-crime rule is to determine the unit of prosecution of the offense at issue. *People v. Almond*, 2015 IL 113817, ¶ 33 (citing *People v. Carter*, 213 Ill. 2d 295, 301 (2004)). The unit of prosecution of an offense refers to what act or course of conduct the legislature has prohibited for purposes of a single conviction and sentence. Here, that requires us to determine whether the offense of aggravated discharge, by its own terms, commands a single conviction per discharge or a single conviction per person in the direction of a discharge. Framed differently, the question is whether defendant in this case committed the offense of aggravated discharge one time or four times with a single shot. Only if we conclude that defendant has committed the offense four times will we move on to consideration of the one-act, one-crime rule.

---

[1]The State asks us, in its opening brief, to review the appellate court's holding that the State effectively charged defendant with shooting only one time at the four officers. The State did not raise this issue in its petition for leave to appeal. On the contrary, it essentially conceded that it was relying on only one discharge to support the four convictions. We therefore find this issue forfeited. *People v. McCarty*, 223 Ill. 2d 109, 122 (2006) (noting "the failure to raise an issue in a petition for leave to appeal results in the forfeiture of that issue before this court").

¶ 68 Determining the unit of prosecution is a question of statutory interpretation. *Carter*, 213 Ill. 2d at 300-01. The fundamental rule of statutory interpretation is to ascertain and give effect to the legislature's intent, and the best indicator of that intent is the statutory language, given its plain and ordinary meaning. *Cooke v. Illinois State Board of Elections*, 2021 IL 125386, ¶ 52. The statute must be viewed as a whole, and as such, this court construes words and phrases not in isolation but relative to other pertinent statutory provisions. *State ex rel. Leibowitz v. Family Vision Care, LLC*, 2020 IL 124754, ¶ 35. We likewise keep in mind the subject addressed by the statute and the legislature's apparent intent in enacting it. *People ex rel. Madigan v. Wildermuth*, 2017 IL 120763, ¶ 17.

¶ 69 In construing a criminal statute, courts must resist the impulse to speculate regarding legislative intent, for "probability is not a guide which a court, in construing a penal statute, can safely take." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 105 (1820). Consequently, this court employs the doctrine of lenity to resolve any ambiguity in criminal statutes in the defendant's favor. *Carter*, 213 Ill. 2d at 301 ("Criminal or penal statutes must be strictly construed in the defendant's favor, 'and nothing should be taken by intendment or implication beyond the obvious or literal meaning of the statute.' " (quoting *People v. Davis*, 199 Ill. 2d 130, 135 (2002))). This court has followed the lead of the United States Supreme Court in applying the doctrine of lenity where the unit of prosecution is unclear. *E.g.*, *People v. Manning*, 71 Ill. 2d 132, 135-36 (1978) (citing *Bell v. United States*, 349 U.S. 81 (1955)); *Castle v. United States*, 368 U.S. 13 (1961) (*per curiam*); and *Carter*, 213 Ill. 2d at 302-03 (citing *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 220-21 (1952), and *Bell*, 349 U.S. at 83). In such situations, a statutory provision imposes a single conviction for a single act unless multiple convictions are unambiguously commanded by the legislature. *E.g.*, *Manning*, 71 Ill. 2d 132; *Carter*, 213 Ill. 2d 295.

¶ 70                    *Multiple Victims and Multiple Convictions*

¶ 71 Before we interpret the statute itself, we address how the "victim" or "victims" of the crime is to be assessed in a unit of prosecution analysis. The State suggests that the number of victims *controls* the unit of prosecution analysis, citing the

proposition that "it is well settled that separate victims require separate convictions and sentences." *People v. Shum*, 117 Ill. 2d 317, 363 (1987).

¶ 72 In *Shum*, the defendant killed a pregnant woman and was convicted of two separate crimes, murder and feticide. *Id.* at 332. The defendant argued under the one-act, one-crime principles of *King* that his single act of killing the mother could only support one conviction. *Id.* at 363. This court noted that there were two distinct victims of the defendant's crime and then stated, "it is well settled that separate victims require separate convictions and sentences." *Id.* The court went on, "In addition, the crime of feticide is not a lesser included offense of murder. *** Since there were two victims involved and feticide is not a lesser included offense of murder, both convictions may stand." *Id.* at 363-64.

¶ 73 *Shum* does not stand for the proposition that the unit of prosecution of every offense must be based on the number of victims. *Shum* involved a one-act, one-crime analysis, and not a unit of prosecution analysis. The distinction between the two analyses is significant. The one-act, one-crime rule is a product of Illinois courts and generally relates to whether there is some fundamental unfairness in imposing multiple convictions and sentences for a single prohibited course of conduct. This question arises usually (though not exclusively) when two distinct offenses are charged based on the exact same conduct, as was the case in *Shum*. In contrast, a unit of prosecution question is one of statutory construction, common to courts around the country, aimed at determining how many times the same offense has been committed in a particular course of conduct. Thus, there was no unit of prosecution analysis in *Shum* because it was clear that the elements of both offenses had been satisfied one time each. The question there became whether it was proper to impose two convictions for two distinct offenses based on precisely the same act. Here, the question is how many times the offense of aggravated discharge has actually been committed. While the number of victims may control in a one-act, one-crime analysis, it does not control in a unit of prosecution analysis.

¶ 74 Somewhat in the alternative, the State asserts that this multiple-victims, multiple-convictions principle is simply a tool of statutory interpretation and is not limited to one-act, one-crime cases, citing *People v. Butler*, 64 Ill. 2d 485 (1976). We agree with the general proposition that consideration of the victim or victims is

- 20 -

proper in any statutory interpretation analysis. However, like the other tools of interpretation, it is not singularly controlling.

¶ 75    This point—that the number of victims is not controlling in unit of prosecution cases—is evident upon a cursory review of both federal and Illinois caselaw. For example, in *Bell*, 349 U.S. at 82, the Supreme Court considered the unit of prosecution in a statute that made it a crime to knowingly transport in interstate commerce any woman or girl for the purpose of prostitution or debauchery. Rather than determine who the victim of that offense might be or how many victims were at issue, the Court resolved the question by concluding that Congress had failed to make the unit of prosecution clear and then by applying the doctrine of lenity. *Id.* at 82-84.

¶ 76    The Supreme Court applied *Bell* in the one-paragraph *per curiam* opinion of *Castle*, 368 U.S. 13, where the defendant was convicted on five counts of unlawful transportation of five forged money orders. See *Castle v. United States*, 287 F.2d 657 (5th Cir. 1961) (outlining the facts of the case). Under the principles announced in *Bell*, the simultaneous transportation of five forged money orders constituted a single offense because Congress had not clearly specified the unit of prosecution. *Castle*, 368 U.S at 13. No discussion of victimhood appears. *Id.*

¶ 77    In *Universal C.I.T. Credit Corp.*, 344 U.S. at 218-19, the defendant corporation was charged with criminal violations of the minimum wage, overtime, and record-keeping provisions of sections 15 and 16(a) of the Fair Labor Standards Act of 1938 (29 U.S.C. §§ 15, 16(a) (1950)). Thirty-two counts were brought against the defendant corporation. *Universal C.I.T. Credit Corp.*, 344 U.S. at 219. The six minimum wage counts charged one violation per week; two of the charges related to one employee, two related to a second employee, and one related to a third employee. *Id.* The overtime and record-keeping counts were similarly broken down by both "victim" and "time." *Id.* at 219-20. Despite this breakdown in the charging instrument, the Supreme Court did not determine the unit of prosecution based on the number of employees who were "victimized" by the defendant corporation's violations, nor by the number of "times" the corporation failed to perform its legal duty. Rather, the Court ultimately concluded that Congress had prohibited three courses of conduct: paying less than minimum wage, paying less than the prescribed overtime rate, and failing to keep proper records of work hours. *Id.* at

223-24. Therefore, only three counts were proper, one for each course of conduct constituting a single offense. *Id.* at 226. This case illustrates the potential complexity of the unit of prosecution, the need for clear guidance from the legislature, and the principle that it is not the victim, but what the statute seeks to prohibit, that controls the unit of prosecution analysis.

¶ 78     This court has likewise relied on general principles of statutory interpretation rather than simply looking to the number of victims in such cases. In *People v. Scott*, 43 Ill. 2d 135, 137 (1969), the defendant was charged with three counts of burglary in that he intended to commit three separate crimes as part of his unlawful entry. Only one "victim" was present in the home, but this court did not find that fact dispositive. Rather, we held that the "primary concern in a burglary indictment is with the unlawful entry." *Id.* at 144. Thus, the single entry in that case could only support a single conviction regardless of whether the defendant intended to commit multiple crimes. *Id.*

¶ 79     We conducted a similar analysis where there were multiple victims. In *People v. Cole*, 172 Ill. 2d 85, 92 (1996), the defendant unlawfully entered a home and hid in a closet for some time, whereupon he exited the closet and shot two people, killing one. Relevant here, the defendant was convicted of murder and two counts of home invasion. *Id.* at 93-94. One of the home invasions was predicated on infliction of harm to the murder victim. *Id.* at 100. The defendant argued that the murder and home invasion convictions could not both rest on the same act. *Id.* This court resolved that one-act, one-crime question on unit of prosecution grounds. We held that the home invasion statute supported only a single conviction regardless of the number of people present or victimized, because the statute made it a crime to enter another's home when " 'one or more persons is present.' " *Id.* at 102. This statutory language persuaded us that the legislature intended to impose a single conviction for a single entry regardless of the number of victims. *Id.* In effect, we held that the unit of prosecution of home invasion was based on the number of "invasions" and not the number of victims. This language ("one or more persons is present") is still a part of our home invasion statute today (see 720 ILCS 5/19-6(a) (West 2020)).

¶ 80     In *People v. Lavallier*, 187 Ill. 2d 464, 466 (1999), the defendant was driving drunk when he crashed into another car, severely injuring the two passengers of the

other car. The defendant was found guilty of two counts of aggravated driving under the influence of alcohol (aggravated DUI) based on causing great bodily harm while driving drunk. *Id.* at 467. The appellate court looked to the number of victims to justify multiple convictions, but this court looked to the statute itself instead. *Id.* at 467-68. This court noted that a misdemeanor DUI was aggravated by causing great bodily harm but that "the essential and underlying criminal act remains the same: driving while under the influence of alcohol." *Id.* at 469. Consequently, the single act of driving drunk was not transformed into multiple felonies by virtue of the fact that multiple people were injured as a result. *Id.* To support this holding, we distinguished the offense of aggravated DUI from the offense of reckless conduct (720 ILCS 5/12-5) (West 1994)), which had previously been used to justify multiple convictions based on the injury of multiple persons in a single car crash. *Lavallier*, 187 Ill. 2d at 470 (citing *People v. Grover*, 93 Ill. App. 3d 877 (1981)). We noted that the two offenses were defined differently. *Id.* at 470-71. Reckless conduct was defined in terms of bodily injury or endangerment to an individual, whereas the offense of aggravated DUI was defined in terms of driving while intoxicated and was aggravated by bodily injury to another. *Id.* Lastly, we noted that, if the legislature intended to impose multiple convictions and sentences for aggravated DUI in this scenario, it would have done so explicitly. *Id.* at 471. The legislature has not seen fit to do so.

¶ 81     The last set of cases we will review here is that of *Manning*, *Carter*, and *Almond*. In *Manning*, the defendant was found in possession of both amphetamines and barbiturates. The statute made it " 'unlawful for any person knowingly to possess a controlled substance.' " *Manning*, 71 Ill. 2d at 134 (quoting Ill. Rev. Stat. 1973, ch. 56½, ¶ 1402). The statute listed barbiturates and amphetamines as controlled substances in distinct subsections. The issue before this court was whether simultaneous possession of two controlled substances could support two convictions. *Id.* Noting that other states with a similar statute had held in the affirmative, this court looked to the federal and Illinois caselaw on unit of prosecution cases to hold differently. *Id.* at 134-35. Citing *Bell*, 349 U.S. at 83, we concluded that only one conviction was proper under the statute given the lack of a statutory provision to the contrary. *Manning*, 71 Ill. 2d at 137. That statute has since been amended and now provides, "A violation of this Act with respect to each of the controlled substances listed herein constitutes a single and separate violation of this Act." 720 ILCS 570/402 (West 2020); see Pub. Act 89-404, § 25 (eff. Aug. 20,

1995). No discussion of who the victim of unlawful possession of a controlled substance might be is found in *Manning*.

¶ 82    *Carter* and *Almond* are related cases dealing with a similar issue. In *Carter*, 213 Ill. 2d at 298, the defendant was a felon found in possession of two loaded firearms. The offense of unlawful possession of weapons by a felon prohibited the possession of "any firearm or any firearm ammunition" by a felon. 720 ILCS 5/24-1.1 (West 1996). Defendant was convicted of four counts, one for each firearm and each set of ammunition. *Carter*, 213 Ill. 2d at 298. We concluded, again citing *Bell*, that the unit of prosecution was ambiguous. *Id.* at 306. We therefore applied the doctrine of lenity and vacated three of the four counts. *Id.* The legislature later amended the language to provide, "The possession of each firearm or firearm ammunition in violation of this Section constitutes a single and separate violation." 720 ILCS 5/24-1.1(e) (West 2006); see Pub. Act 94-284, § 10 (eff. July 21, 2005). We recognized that amendment in *Almond*, 2015 IL 113817, ¶¶ 38-39, and noted that the "intent to permit separate convictions for simultaneous possession of a firearm and ammunition under the [statute] could not be clearer."

¶ 83    From these and other cases, it is clear that the number of "victims" does not control the unit of prosecution. Rather, in determining the unit of prosecution, this court looks to the language of the statute to determine what precisely has been prohibited by the legislature and in what unit of time, actions, or instances that crime is committed once. In this analysis, it is the unambiguous intent of the legislature that controls. If the legislature fails to indicate the unit of prosecution, either by an express definition, clear language, or by some unambiguous design of the offense, courts in Illinois will not guess at the answer. In such an event, doubt will be resolved against construing the statute as supporting multiple instances of the same offense based on the exact same act.

¶ 84    *Statutory Construction of Section 24-1.2(a)(3)*

¶ 85    We now construe the statute itself. The provision at issue reads:

"§ 24-1.2. Aggravated discharge of a firearm.

- 24 -

(a) A person commits aggravated discharge of a firearm when he or she knowingly or intentionally:

\* \* \*

(3) Discharges a firearm in the direction of a person he or she knows to be a peace officer, a community policing volunteer, a correctional institution employee, or a fireman while the officer, volunteer, employee or fireman is engaged in the execution of any of his or her official duties, or to prevent the officer, volunteer, employee or fireman from performing his or her official duties, or in retaliation for the officer, volunteer, employee or fireman performing his or her official duties[.]" 720 ILCS 5/24-1.2(a)(3) (West 2016).

¶ 86 We first note that there are at least four possible units of prosecution, best illustrated by the question: How many convictions are imposed by the statute where a defendant shoots twice at a group of four officers? One? Two? Four? Eight? One unit of prosecution might be based on the number of discharges, regardless of the number of people in the direction of discharge (yielding an answer of "two" in our hypothetical). Another unit of prosecution—argued by the State in its closing argument—might be the number of people in the direction of discharge, regardless of the number of discharges (yielding an answer of four). Another might be the number of discharges multiplied by the number of people in the direction of discharge (yielding an answer of eight). Another possibility is that the offense is committed one time regardless of the number of discharges *and* regardless of the number of officers in the direction of discharge (yielding an answer of one). Although we are only being asked how many convictions are imposed by a single shot at four officers, we are cognizant of the far-reaching effect any holding we reach might have. This is, in part, why courts require the legislature to make the answer clear. Ultimately, our function is not to pick what we think would be "best" but to determine which one the people's representatives have commanded in the particular situation before us.

¶ 87 Turning to the statute itself, we find no express definition of the unit of prosecution. Such language permeates the law, and there is no question that the legislature knows how to define the unit of prosecution. For example, the Employee Classification Act provides: "For purposes of this Section, each violation of this

- 25 -

Act for each person and for each day the violation continues shall constitute a separate and distinct violation." 820 ILCS 185/40(a) (West 2020). The Swimming Facility Act makes the violation thereof a misdemeanor and provides: "Each day's violation constitutes a separate offense." 210 ILCS 125/22 (West 2020). The statute governing child pornography provides: "The possession of each individual film, videotape, photograph, or other similar visual reproduction or depiction by computer in violation of this Section constitutes a single and separate violation." 720 ILCS 5/11-20.1(a-5) (West 2020). Notably, that subsection goes on to specify that the possession of multiple copies of an identical depiction only constitutes a single offense. *Id.* As discussed above, the possession statutes for controlled substances and firearms both define the unit of prosecution expressly. 720 ILCS 570/402 (West 2020) ("A violation of this Act with respect to each of the controlled substances listed herein constitutes a single and separate violation of this Act."); 720 ILCS 5/24-1.1(e) (West 2020) ("The possession of each firearm or firearm ammunition in violation of this Section constitutes a single and separate violation.").

¶ 88    The lack of an express definition of the unit of prosecution has led this court to conclude that the unit of prosecution was ambiguous and therefore subject to the doctrine of lenity, as in *Manning* and *Carter*. Even in the absence of such a definition, however, we have discerned the legislature's intent in otherwise clear language. *Cole*, 172 Ill. 2d at 102 (finding the language " 'that one or more persons is present' " persuasive that a single conviction for home invasion is proper where there is a single entry, regardless of the number of people present in the home (quoting 720 ILCS 5/12-11 (West 1992))); see also *Ebeling v. Morgan*, 237 U.S. 625 (1915) (noting that the language of the offense plainly indicated intent to protect mailbags); *Blockburger v. United States*, 284 U.S. 299 (1932) (stating that the offense prohibited each individual sale of narcotics). However, no such language appears in this offense.

¶ 89    The State suggests that, because the statute lacks this kind of clear language (*e.g.*, "in the direction of *one or more peace officers*"), we can safely conclude that the legislature commanded multiple convictions for a single discharge in the direction of multiple peace officers. We do not agree. This kind of analysis distorts the strict construction required in criminal statutes. Regardless, this assertion assumes too much; the absence of expressly stated intent in one direction does not

yield a showing of clear intent in the other direction. It merely leaves the statute without any clearly stated intent. Nor can any potential ambiguity be resolved with this kind of analysis. Such analysis would invert the doctrine of lenity by holding that, since the legislature did not expressly command a single conviction, it therefore commanded multiple convictions.

¶ 90    Even in the absence of an express definition or clear language, this court has discerned the unit of prosecution by virtue of the design of the offense itself, such as in *Lavallier*, 187 Ill. 2d at 469 (a single conviction for aggravated DUI is proper even where multiple people are injured in a resulting car crash), and *Scott*, 43 Ill. 2d at 144 (a single conviction of burglary is proper despite the intent to commit three separate crimes because "[t]he primary concern in a burglary indictment is with the unlawful entry"). See also *Universal C.I.T. Credit Corp.*, 344 U.S. at 226 (holding that the statute prohibited a course of conduct, rather than individual instances of violating a statutory duty). We therefore turn to the design of the offense itself to determine what exactly has been criminalized.

¶ 91    At its core, the offense of aggravated discharge criminalizes firing a gun in the direction of a person or in the direction of a building or vehicle that has people in it. See 720 ILCS 5/24-1.2(a)(1), (2) (West 2016). The punishment is enhanced if the discharge is in the direction of certain classes of people or vehicles, such as police officers, medical service personnel, school teachers, etc. *Id.* § 24-1.2(a)(3)-(9), (b). It is the "discharge in the direction of," and not any other harm or injury, that is criminalized. This is evidenced by the fact that no proof of any other harm or injury, apart from whatever harm is implicit in the "discharge in the direction of" itself, is required to prove the commission of the offense.

¶ 92    The statute makes both of these conditions—the discharge and the direction—necessary for criminal punishment. The crime is not completed without a discharge, yet a mere discharge does not suffice. The physical act required for the crime is not merely pulling the trigger but pulling the trigger while the gun is pointed in a particular direction. The offense appears to criminalize each qualifying discharge, but it also appears to criminalize each "in the direction of" condition that is met, *i.e.*, it appears to criminalize each instance of a person, building, or vehicle being in the direction of discharge.

¶ 93    Consequently, we cannot say that the legislature has unambiguously outlined the unit of prosecution in an aggravated discharge. It is possible to conclude from the statute that the unit of prosecution is dependent upon the number of discharges, given that the physical act required to complete the offense is an actual discharge, that it is a certain kind of discharge *itself* that is prohibited, and that no harm or injury other than that inherent in the discharge itself is required for the offense to be complete. On the other hand, it is just as possible to conclude that the unit of prosecution is based upon the number of people, vehicles, or buildings in the direction of discharge given that the statute specifically delineates these specific categories; that the statute contains design elements directed at protecting these categories; and that one might conclude that there is an inherent harm suffered by each object in the direction of discharge that the statute seeks to criminalize.

¶ 94    We will not, therefore, take our best guess at what the legislature wanted. The legislature has the authority, responsibility, and ability to expressly define the unit of prosecution and does so often. Here, however, it has left that task to the judiciary. We therefore apply the doctrine of lenity, as we have repeatedly in this situation, to conclude that a single discharge in the direction of multiple peace officers constitutes a single offense. *Manning*, 71 Ill. 2d at 137 (citing *Bell*, 349 U.S. at 83); *Carter*, 213 Ill. 2d at 306 (same).

¶ 95                                    CONCLUSION

¶ 96    As to the speedy trial claim, defendant did not demand trial in the statutorily directed manner, and therefore he is considered to have agreed to the first continuance. We find no abuse of discretion in granting the State's first motion for continuance. We therefore find no violation of defendant's statutory speedy trial right, and counsel was not ineffective for pursuing futile motions on this issue. The erroneous and contradictory jury instructions, however, require reversal and retrial. On retrial, the unit of prosecution issue is likely to recur. Where the legislature can, but does not, define the unit of prosecution, this court will apply the doctrine of lenity. We hold that the offense of aggravated discharge of a firearm does not clearly define the unit of prosecution. Consequently, a single discharge in the direction of multiple police officers can sustain only one conviction. We remand

- 28 -

for retrial consistent with this opinion.

¶ 97    Affirmed in part and reversed in part.

¶ 98    Cause remanded.

¶ 99    JUSTICE CARTER, specially concurring:

¶ 100    I agree with the majority's determination that, as a matter of statutory construction, a *single* discharge from a firearm in the direction of peace officers can sustain only one conviction for aggravated discharge of a firearm. *Supra* ¶ 97. Fundamentally, firing a single shot from a gun constitutes one act. If the legislature wants to authorize multiple convictions based on that single act, it must make that intention explicit. I also agree with the majority's resolution of the cross-appeal, including their determination that the erroneous and contradictory jury instructions require a new trial. *Supra* ¶ 97.

¶ 101    I write separately, however, to clarify that our holding in this case should not be interpreted as prohibiting multiple convictions for aggravated discharge of a firearm when an offender fires *multiple* shots at more than one person. There can be no question that firing a gun more than once at different victims constitutes distinct acts that would support multiple convictions for aggravated discharge of a firearm. The majority's holding here is limited to a single gunshot, concluding that "a single discharge in the direction of multiple police officers can sustain only one conviction [for aggravated discharge of a firearm]." *Supra* ¶ 97.

¶ 102    At issue in this case is subsection (a)(3) of the aggravated discharge of a firearm statute, which provides that a "person commits aggravated discharge of a firearm when he or she knowingly or intentionally *** [d]ischarges a firearm in the direction of *a person* he or she knows to be *a peace officer *** while *the officer *** is engaged in the execution of any of *his or her official duties*." (Emphases added.) 720 ILCS 5/24-1.2(a)(3) (West 2016). The statute consistently uses singular terms to refer to the identified victim of the crime. Applying the plain meaning to this language, I agree with the State that the clear legislative intent of subsection (a)(3) is to protect individual officers from personal harm while on duty.

¶ 103     This conclusion is consistent with the aggravated discharge of a firearm statute when viewed as a whole. See *People v. Casas*, 2017 IL 120797, ¶ 18 (when construing a statute, the reviewing court "must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation"). Section 24-1.2 broadly criminalizes discharging a firearm in the direction of an occupied building, an occupied vehicle, and at "a person" in various enumerated situations. 720 ILCS 5/24-1.2(a)(1)-(a)(9) (West 2016). Generally, the offense of aggravated discharge of a firearm is a Class 1 felony, but the offense is a Class X felony when the offender shoots at a peace officer, a community policing volunteer, a correctional institution employee, a fireman, an emergency management or medical services worker, a teacher, or a school employee, when that individual is engaged in the execution of his or her official duties. *Id.* § 24-1.2(b). Again, the identity and status of the victim is repeatedly referenced in the singular tense, suggesting legislative intent that *each* victim fired at by the offender constitutes a separate commission of the offense when the offender fires more than one shot.

¶ 104     In light of this framework, it is apparent that the overarching legislative goal of the aggravated discharge of a firearm statute is to deter gun violence by criminalizing the conduct of shooting a gun in the direction of another individual. To achieve that purpose, the State may seek multiple convictions of the offense when an offender fires several shots at more than one person. When several shots are fired at more than one person, there are multiple acts (each shot from the gun) and separate victims (each individual shot at by the offender). As this court has long recognized, "it is well settled that separate victims require separate convictions and sentences." *People v. Shum*, 117 Ill. 2d 317, 363 (1987).

¶ 105     I would respectfully suggest it would be illogical to conclude that only one violation of the aggravated discharge statute has occurred when an offender shoots more than once in the direction of several different victims. It would also undermine the General Assembly's goal of discouraging gun violence, which is a construction this court must necessarily reject. See *People v. Garcia*, 241 Ill. 2d 416, 427 (2011) (when construing a statute, legislative intent is paramount, and all other rules of statutory construction are subordinate).

¶ 106     Although the majority's opinion is limited to a single discharge, I believe it is important to recognize that when an offender discharges a firearm more than once at different victims the State may prosecute a separate charge of aggravated discharge of a firearm for each victim targeted by the offender's gunfire. This is especially true when the victim is a public servant providing a vital public service at the time of the shooting. See 720 ILCS 24-1.2(b) (West 2016) (imposing a Class X felony sentence when the victim is a public employee engaged in his or her official duties). In my opinion, for purposes of subsection (a)(3), when an offender discharges a gun more than once at separate officers, each officer shot at by the offender constitutes a separate victim and justifies a separate conviction. See, *e.g.*, *People v. Files*, 260 Ill. App. 3d 618, 620 (1994) (affirming defendant's two convictions of aggravated discharge of a firearm when the evidence demonstrated that defendant fired multiple shots during a "gun battle with two police officers").

¶ 107     In summary, I believe that the State may obtain multiple convictions under subsection (a)(3) if the State can prove beyond a reasonable doubt that (1) the offender fired multiple shots at more than one officer engaged in his or her official duties and (2) the offender discharged his gun in the direction of each individual officer named in the charging instrument. 720 ILCS 5/24-1.2(a)(3) (West 2016). For these additional reasons, I specially concur in the majority's decision.

¶ 108     JUSTICE NEVILLE joins in this special concurrence.