NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220503-U

NO. 4-22-0503

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 6, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Fulton County |
| DYLAN E. A. | ) | No. 20CF132 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas B. Ewing, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court remanded for a hearing to determine the accuracy of the
report of proceedings and to make any necessary corrections concerning the
wording of a jury instruction.

¶ 2   In June 2020, the State charged defendant, Dylan E. A., with predatory criminal

sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)) and criminal sexual assault

(720 ILCS 5/11-1.20(a)(3)) in connection with the sexual abuse of his son, J.A.  According to the

report of proceedings, the trial court mistakenly instructed the jury it should find defendant guilty

if any of the elements of the crime were proved beyond a reasonable doubt instead of instructing

all the elements must be proved.  However, the record also indicates the report of proceedings

may have been erroneously transcribed and the correct instruction was given.

¶ 3   On appeal, defendant contends the trial court plainly erred by giving the incorrect

instruction.  In the alternative, he contends his trial counsel rendered ineffective assistance by

failing to object to the instruction. He also argues the State failed to prove him guilty beyond a reasonable doubt because of inconsistencies in J.A.'s testimony. We remand for a hearing to determine the accuracy of the report of proceedings regarding the jury instruction and retain jurisdiction over this appeal to consider the merits of defendant's claims based on an accurate record.

¶ 4                                    I. BACKGROUND

¶ 5            On June 19, 2020, the State charged defendant with predatory criminal sexual assault of a child, alleging defendant, who was age 17 or older, committed an act of sexual contact with J.A., who was under 13 years of age at the time of the act, in that defendant made contact with the anus of J.A. with defendant's penis for the purpose of sexual gratification or arousal. The State also charged defendant with criminal sexual assault, alleging defendant committed an act of sexual penetration with J.A., who was under 18 years of age at the time of the act. In August 2021, a jury trial was held.

¶ 6            Evidence at trial showed that, on June 14, 2020, the Department of Children and Family Services (DCFS) received an anonymous report alleging defendant had sexually abused J.A., who was six at the time. At the time of the call, J.A. lived with defendant, who had an order of protection against J.A.'s mother, Lynzie A. Lynzie no longer lived at the family home. Sergeant Matthew Watters of the Fulton County Sherriff's Office testified that, on June 16, 2020, he received a call from Lynzie stating she had returned to the family home and found used condoms, which were collected and submitted to the crime lab. Watters did not obtain a search warrant to look for further evidence at the home.

¶ 7            On June 18, 2020, Phyllis Todd, a forensic interviewer with the Child Advocacy Center (CAC), interviewed J.A. During the interview, J.A. told Todd defendant touched him

inappropriately and anally penetrated him. A DCFS investigator had a discussion with Lynzie about taking J.A. for a physical examination at the Pediatric Resource Center (PRC). According to the investigator, Lynzie initially declined, stating "she didn't have time and there was a family member issue." Another witness stated Lynzie was reluctant because she thought the examination would be traumatic. However, after a delay, Lynzie agreed to take J.A. for the examination.

¶ 8        Dr. Channing Petrak, medical director of the PRC, testified she examined J.A. on June 24, 2020. There were no abnormal findings from J.A.'s physical examination, which Petrak testified would be expected unless a child was examined within a day or so after the incident occurred. Petrak stated normal findings do not exclude or establish abuse. Petrak did not feel it was necessary to search for biological trace evidence such as skin cells or semen because the best chance for that kind of evidence collection was in the first 24 hours after an incident of sexual contact. Since Petrak did not see J.A. for almost two weeks after the reported contact, it would not have been useful.

¶ 9        J.A. testified he was seven years old and currently lived with his foster parents. He testified he knew the difference between the truth and a lie and said he would tell only the truth in court. J.A. said "[b]efore DCFS," he lived with his father. J.A. testified about the abuse as follows:

> "Q. Did you ever do things with your dad when you lived with him?
>
> A. No, not really.
>
> Q. When you lived with your mom and your dad, did your house have— what kind of house did you live in?
>
> A. Yellow.

Q. Did it have rooms in it?

A. Yes.

Q. Did it have a basement in it?

A. Yes.

Q. Did you ever do anything with your dad in the basement?

A. Yes.

Q. What kind of things did you do with your dad in the basement?

A. Sex abuse.

Q. Okay. Well, when you say abuse, what do you mean by that?

A. My dad and me had been having sex.

Q. Okay. Has anyone ever talked to you about good touching and bad touching?

A. No.

Q. Do you know what good touching and bad touching is?

A. No.

Q. Do, are there private parts on your body that you know of?

A. Yes.

Q. And can you tell me what you believe the private parts are?

A. The penis and the butt."

At the State's request, J.A. stood up and demonstrated the location of his "butt" by pointing to the "the rear area of his bottom." The colloquy then continued as follows:

"Q. And you said in the basement, you and your dad would have sex. Did that ever involve your penis or your butt?

A. Yes.

Q. Could you tell me about that, how that worked?

A. I don't really remember.

Q. Okay. Do you remember if you touched your dad's penis or your dad's butt?

A. No.

Q. You don't remember?

A. No.

Q. Well, you said your dad and you would have sex. What did you mean by that? Could you tell me what you mean by that or how that worked?

A. I don't really know.

Q. Okay. Did you ever tell anyone about your dad and you having sex in the basement?

A. No.

Q. Do you remember how you and your dad started having sex?

A. No.

Q. Do you remember what would happen after you and your dad had sex?

A. No.

Q. Now, when you and your dad had sex, what did it feel like?

A. It hurted.

Q. And when you say what, what part—It hurt you?

A. Yeah.

Q. And what part of you hurt?

A. The back hind, the back hind.

Q. The back kind or the bad kind?

A. The bad kind.

Q. What do you mean by bad kind?

A. My butt.

Q. Do you remember what made your butt hurt?

A. No.

Q. Do you remember if it hurt a little or a lot or somewhere in between?

A. A lot.

Q. What did your dad do to you that made it hurt a lot?

A. Puts his penis in my butt.

Q. And do you remember after he put his penis in your butt, what would you guys do next?

A. We put our clothes back on.

Q. Now, you said you didn't tell anybody about this?

A. No.

Q. Is there a reason why you didn't tell anybody about this?

A. My father, my father told me don't."

¶ 10        J.A. initially testified he did not remember Todd, but then said she was the first person he told about the abuse. He said he did not tell his mother about the abuse. No one told him what to say in court. He also testified he previously watched "Jeffy videos" on YouTube that his parents did not want him to watch. He said they were "kind of funny." In one of those videos "the daddy spanked Jeffy," and Jeffy called 911 and reported his father for sexual assault.

In the video Jeffy said, "[m]y dad put his hand in my butt." J.A. did not watch any other Jeffy videos that talked about sex.

¶ 11 A DVD of Todd's CAC interview with J.A. was played for the jury and entered into evidence but not transcribed. Todd testified she was trained using methods intended to get children "to talk without putting the words in their mouth." In the interview, J.A. initially denied anyone touched him inappropriately. However, he later told Todd about instances of sexual abuse that occurred in the basement, bathroom, and bedrooms of the home. J.A. stated defendant put his "weenie" in J.A.'s "butt" and that it hurt. J.A. also described instances in which defendant had J.A. try to put his "weenie" in defendant's "butt" but J.A. said it did not work out very well. Defendant also asked J.A. to digitally penetrate him. J.A. said when the process was over, he and defendant would take a shower and wash the "white stuff" off. Todd asked J.A. on at least two occasions who he could tell if someone touched him inappropriately. J.A. said he could call 911 or tell his mother, teacher, or friends. He said the sexual contact was secret and defendant told him not to tell anyone. However, J.A. said he told Lynzie and other people.

¶ 12 During the interview, J.A. told Todd he sometimes watched inappropriate YouTube videos and described "Jeffy" videos, which had bad words or in which a person put a pencil up his nose. He also described watching or reading violence from "Minecraft" or "Creepypasta." J.A. also figured out the password for defendant's phone and saw a picture of a "boob" on it. He said no one took nude photos of him and he did not see nude photos of himself on defendant's phone. However, J.A. also mentioned hacking and said he thought there were invisible cameras in the house.

¶ 13 Defendant introduced an exhibit of a transcript of an adjudicatory hearing involving J.A. During that hearing, J.A. testified defendant touched his penis and butt and

defendant asked J.A. to touch defendant's penis and butt. J.A. said he never saw any videos on YouTube where somebody was touching somebody else's penis or butt.

¶ 14 Lynzie testified that, when the family was still together, J.A. preferred baths, and she had never known defendant and J.A. to shower together. She did not notice any injuries around J.A.'s butt or penis or unusual behavioral problems. She said J.A. never disclosed anything of a sexual nature to her. However, J.A. told her defendant had a relationship with another woman. She said J.A. was savvy with electronics and figured out how to get around parental blockers on YouTube. She testified she previously caught him watching "Jeffy videos" and "Sons of Anarchy." She said they had never been hacked and she did not know why J.A. would talk about hidden cameras. However, she also said J.A. watched "a lot of conspiracy theory-type stuff on YouTube."

¶ 15 Lynzie testified she went home after learning of the allegations and found two condoms. It took three days for the police to come pick them up. She did not immediately take J.A. for a physical examination because she took the first appointment date they had open. She did not ask for an earlier date because her uncle had just passed away. Lynzie stated, other than finding the condoms and being told of the allegations, she had no other reason to believe defendant would abuse J.A. Lynzie testified she had confronted defendant about his new relationship. She further testified she and defendant were in the process of working out their differences, and they were trying to stay together. She also said she took the allegations seriously and loved J.A.

¶ 16 Dexter McElhiney of the Illinois State Police Crime Lab testified as an expert in deoxyribonucleic acid analysis. McElhiney analyzed the condoms found in the home. All profiles determined as male matched defendant and not J.A. Defendant did not testify, and the

trial court denied his motion for a directed verdict. During closing, defendant argued the evidence was insufficient to prove him guilty beyond a reasonable doubt based on inconsistencies and lack of details in J.A.'s testimony.

¶ 17    At the jury instruction conference, the trial court stated it would give the State's instruction based on Illinois Pattern Jury Instructions, Criminal, No. 11.104 (approved Apr. 29, 2016) (hereinafter IPI Criminal No. 11.104). The written instruction provided:

"To sustain the charge of predatory criminal sexual assault of a child, the State must prove the following propositions:

*First Proposition*: That the defendant knowingly committed an act of contact, however slight, between the anus of one person and the part of the body of another for the purposes of sexual gratification of the defendant; and

*Second Proposition*: That the defendant was 17 years of age or older when the act was committed; and

*Third Proposition*: That [J.A.] was under 13 years of age when the act was committed.

If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 18    After closing arguments, the trial court admonished the jury regarding its instructions as to a defendant's presumed innocence, interpretation of circumstantial evidence,

and the importance of weighing the evidence and circumstances as fact finders. The court also correctly read IPI Criminal No. 11.104 to the jury as follows:

"A person commits the offense of predatory criminal sexual assault of a child when he is 17 years of age or older and knowingly commits an act of contact, however slight, between the sex organ or anus of one person and the body—and the part of a body of another for the purpose of sexual gratification of the defendant and the victim is under 13 years of age.

To sustain the charge of predatory criminal sexual assault of a child, the State must prove the following propositions: First proposition, that the defendant knowingly committed an act of contact, however slight, between the anus of one person and the body part of—and the part of the body of another, of another for the purpose of sexual gratification of the defendant; and second proposition, that the defendant was 17 years of age or older when the act was committed; and third proposition, that J.A. was under 13 years of age when the act was committed.

If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty. If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 19    The trial court told the jurors that for each charge, they would receive two verdict forms for each count. The State then brought a scrivener's error to the attention of the court, telling the court IPI Criminal No. 11.104 used J.A.'s initials when it should have used his full name. The court stated it would read the instruction again. However, the court reporter's

transcript shows that, when the court reread the instruction, it misstated J.A.'s first name and also misstated the final portion of the instruction as follows:

"If you find from the consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty. If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant guilty."

Thus, the instruction incorrectly stated the jury must find defendant guilty even if it found that not all the propositions had been proved beyond a reasonable doubt. There were no objections or corrections by either party.

¶ 20        After the jury retired to consider the verdict, the trial court stated:

"I have both counsel here. The jury has retired. The clerk has given me the defendant's exhibits, State's exhibits. I also have the, the video. There is no place to, to run that in there and, you know, I can, I'll put that in there with the State's packet just so you know it's in there, and I want to make a, correct that scrivener's error on that one instruction and then give them the instructions."

The State told the court it would correct the instruction and the court stated, "Yeah. Let's just type it again." The court further said, "If you could do that and bring that up, please." However, the record does not definitively show whether the corrected instruction was ever sent to the jury room. The copies of the instructions in the record list J.A.'s correct name and do not misstate "guilty" instead of "not guilty" at the end of the instruction.

¶ 21        The jury retired to consider its verdict at 10:53 a.m. According to the record sheet, the jury reached a decision 42 minutes later at 11:35 a.m. and returned to read their verdict

in the courtroom at "1:46," without delineating a.m. or p.m. However, according to the court reporter's transcript, the trial court stated the jury returned to the courtroom at "approximately 11:47 p.m."

¶ 22    The jury found defendant guilty of both counts. Defendant filed a motion for a new trial, arguing in part the jury could not have properly considered the evidence because it "came back with a verdict very fast." The motion did not raise any issues with the alleged errors in the jury instructions. In December 2021, the trial court allowed a stipulated substitution of defense counsel. New counsel filed an amended motion for a new trial, alleging defendant's trial counsel was ineffective when he failed to object to the erroneous jury instruction.

¶ 23    At a May 10, 2022, hearing on the motion for a new trial, defense counsel stated the transcript showed a discrepancy in the jury instructions and, referring to IPI Criminal No. 11.104, counsel stated:

> "[I]t was relayed to [the jury] if (a) happens, you have to find the defendant guilty; if (b) happens, you have to find the defendant guilty. It might have been just an error, might have been a misreading. It could have been a Freudian slip, it's unclear, and I will concede that the written instructions do, in fact, I would imagine they would match what the—the correct instructions."

¶ 24    The State argued the misstatement was not emphasized and expressed doubt about the transcript's accuracy, stating: "Here, I don't think anybody even heard you misstate that, if you did. I'll be honest with you, I know it's a transcript, and I know it's signed to that this is what happened. I'm not even sure that misstatement was even made." The trial court also stated it "was surprised by the transcript," and the court stated:

"That's not my memory and every instruction I read, I move my finger along the line and I'm looking at it very closely to read it. I think it's very possible the transcript is not right but I and also, it's just not logical, and I think there's no question that the instruction was correct and the instructions were given to the jury and taken to the jury room, and that is part of their obligation is to rely upon the instructions, but I have, in other trials, at least on one occasion, I made a misstatement and caught myself and corrected it, and I—I just was surprised so I think it's—it's possible the transcript is not right, but I'm—the instruction clearly was correct. I'm just putting that down since I was there and you were not, [defense counsel]. [The state's attorney] was there. So I was—I was surprised by the transcript."

The court found the written instruction controlled, and any error concerning the oral instruction would have been harmless.

¶ 25        The trial court sentenced defendant to 25 years' incarceration on count I, predatory sexual assault of a child. The record does not reflect the court imposed a sentence on count II, criminal sexual assault, nor does it indicate whether the court merged count II into count I for purposes of sentencing. We note the State's brief indicates "[t]he court postponed sentencing defendant in count II." The court reporter later filed an amended page to the trial transcript changing the incorrect name in the court's reading of IPI Criminal No. 11.104 to J.A.'s correct name. The amendment did not change the court's purported error in misstating "guilty" instead of "not guilty" at the end of the instruction.

¶ 26        This appeal followed.

¶ 27                                II. ANALYSIS

- 13 -

¶ 28        On appeal, defendant first contends his conviction cannot stand because the trial court incorrectly instructed the jury he could be found guilty if it found the State proved beyond a reasonable doubt any of the propositions in IPI Criminal No. 11.104. However, the State argues it is likely the transcript of the report of proceedings is in error and the instruction was correctly given. In the alternative, the State contends any error was minor such that it was harmless or could not be plain error.

¶ 29        Defendant concedes he failed to object to the instruction at the time it was read, but he argues plain error applies. The failure to object at trial to a perceived error and to raise that issue in a subsequent posttrial motion results in forfeiture of the question on review unless it can be considered plain error. See *People v. James*, 255 Ill. App. 3d 516, 526, 626 N.E.2d 1337, 1345 (1993). A vital part of a trial is the trial court's reading of instructions to the jury at the close of the arguments. *James*, 255 Ill. App. 3d at 526, 626 N.E.2d at 1345. "[A] defendant who claims he is not guilty, as does defendant in this case, is entitled to have the jury given the option of acquitting him." *James*, 255 Ill. App. 3d at 526, 626 N.E.2d at 1345. Our supreme court has held a jury-instruction error rises to the level of plain error when it "creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." *People v. Hopp*, 209 Ill. 2d 1, 8, 805 N.E.2d 1190, 1194 (2004). However, a defendant need not prove the error in the instruction misled the jury. See *People v. Herron*, 215 Ill. 2d 167, 193, 830 N.E.2d 467, 483 (2005).

¶ 30        The parties do not dispute that, if the trial court incorrectly read IPI Criminal No. 11.104, it was an incorrect statement of the law. We note that, "for an accused to be convicted of a criminal offense, the jury must find that each element of the offense has been proven beyond a reasonable doubt." *James*, 255 Ill. App. 3d at 528, 626 N.E.2d at 1346. Here, the instruction

purportedly read to the jury incorrectly instructed the jury it could find defendant guilty if any element of the crime was proved beyond a reasonable doubt. In a closely analogous case, this court previously stated, albeit in *dicta*, that a similar error would be reversible error. *People v. Dailey*, 188 Ill. App. 3d 683, 686, 544 N.E.2d 449, 452 (1989), *abrogated on other grounds*, *People v. Wendt*, 163 Ill. 2d 346, 351-52, 645 N.E.2d 179, 182 (1994).

¶ 31     We also note the trial court held the written instruction controlled. However, "the mere fact that correct instructions are found in the court file is insufficient to prove that the jury was so instructed." *James*, 255 Ill. App. 3d at 528, 626 N.E.2d at 1346. Instead, our supreme court has held that, when instructions are contradictory, " 'the jury cannot perform its constitutional function.' " *People v. Hartfield*, 2022 IL 126729, ¶ 58, 202 N.E.3d 890 (quoting *People v. Jenkins*, 69 Ill. 2d 61, 66, 370 N.E.2d 532, 534 (1977)). Thus, " 'it is well established that the giving of contradictory instructions on an essential element in the case is prejudicial error, and is not cured by the fact that another instruction is correct.' " *Hartfield*, 2022 IL 126729, ¶ 58 (quoting *Jenkins*, 69 Ill. 2d at 66, 370 N.E.2d at 534). As a result, our supreme court stated in *Hartfield*:

> "Whereas a single erroneous instruction might be cured by other instructions or by some other showing of a lack of prejudice, two directly conflicting instructions on an essential element, one stating the law correctly and the other erroneously, cannot be cured this way due to the simple fact that we can never know which instruction the jury was following. What is at issue with this error is the integrity of the judicial system itself. Thus, regardless of whether it is plain-error or harmless-error analysis, such an error is presumed to be prejudicial." *Hartfield*, 2022 IL 126729, ¶ 59.

- 15 -

¶ 32　　　　As the previous discussion illustrates, on the record before us, the incorrect reading of the instruction is a matter of concern that arguably amounts to plain error. While the trial court read the correct instruction once, the current report of proceedings shows it was then read incorrectly. Further, it is at least arguable the written instruction would not necessarily control and, in any event, because the instruction was taken by the State to be retyped, and the record indicates the jury may have returned quickly with a verdict, it is unknown based on the record before us if the correct instruction was sent to the jury room before the jury reached a verdict. Additionally, the matter is complicated by evidence that the report of proceedings is inaccurate and the correct instruction may have been read. As a result, as we discuss below, we remand for a hearing to determine the accuracy of the record.

¶ 33　　　　Normally, " '[a] reviewing court is bound by the certified record of proceedings in the trial court, and the record is presumed to be correct unless it can be shown to be otherwise.' " *James*, 255 Ill. App. 3d at 528, 626 N.E.2d at 1346 (quoting *People v. Bland*, 228 Ill. App. 3d 1080, 1086, 593 N.E.2d 639, 644 (1992); see also *People v. Allen*, 109 Ill. 2d 177, 184, 486 N.E.2d 873, 875 (1985); *People v. Vincent*, 165 Ill. App. 3d 1023, 1028, 520 N.E.2d 913, 918 (1988)). However, regarding the accuracy of the report of proceedings, we are also guided by Illinois Supreme Court Rule 329 (eff. July 1, 2017), which provides in part: "Any controversy as to whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by that court and the record made to conform to the truth." In addition, "[m]aterial omissions or inaccuracies or improper authentication may be corrected *** by the trial court, either before or after the record is transmitted to the reviewing court ***."

¶ 34　　　　While there was some informal discussion in the trial court about the accuracy of the record, no formal hearing to determine the question was held. Further, "[i]t is well

established that a party may not prove an inaccuracy in the record merely by presenting oral testimony." *Allen*, 109 Ill. 2d at 184, 486 N.E.2d at 875. "Rather, the inaccuracy must 'be proved by the production of some note or memorandum from the records or quasi-records of the court, or by the judge's minutes, or by the papers on file in the cause.' " *Allen*, 109 Ill. 2d at 184, 486 N.E.2d at 875 (quoting *People v. Miller*, 365 Ill. 56, 58, 5 N.E.2d 458, 460 (1936)). For example, the testimony of the court reporter, accompanied by the original stenographic notes, may resolve an inaccuracy. See *Allen*, 109 Ill. 2d at 184, 486 N.E.2d at 875.

¶ 35        Here, some evidence exists in the record to show the error did not occur because no one noticed an error at the time the instruction was read, and neither the state's attorney nor the trial court recalled an incorrect reading of the instruction. However, that is insufficient to prove the record is inaccurate. Meanwhile, defendant notes evidence of another discrepancy in the record concerning the time the jury returned with a verdict. Based on inconsistencies in J.A.'s testimony and multiple statements from J.A. that he did not remember various events, defendant argues the record indicates the jury came back unusually fast in a close case, supporting the conclusion the incorrect instruction was given, and the jury relied on it. Defendant further notes the court reporter, in submitting a corrected page to the report of proceedings, corrected only J.A.'s name and did not correct the remainder of the instruction. Thus, we cannot tell from the current report of proceedings whether the State's argument the record is incorrect has merit.

¶ 36        Given the ambiguity presented by the record, instead of deciding the issue of any error in the instructions or determining defendant's remaining arguments of ineffective assistance of counsel and the sufficiency of the evidence, we instead remand under Rule 329 for a hearing to determine the accuracy of the record and for any necessary corrections. See *People*

*v. Partee*, 153 Ill. App. 3d 841, 846, 506 N.E.2d 629, 633 (1987) (remanding *sua sponte* for an evidentiary hearing as provided by Rule 329). In doing so, we further exercise our discretion to retain jurisdiction over this appeal to consider the merits of defendant's claims after a hearing is conducted and any necessary corrections to the record are made. See *People v. Cooper*, 2021 IL App (1st) 190022, ¶ 22, 207 N.E.3d 166.

¶ 37                                    III. CONCLUSION

¶ 38          For the reasons stated, we remand this matter to the trial court for the limited purpose of conducting a hearing to determine the accuracy of the record and to make any necessary corrections. We retain jurisdiction over this appeal to consider the merits of defendant's claims based on an accurate record.

¶ 39          Remanded with directions.